UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Case No. 19-cr-130(3) (PAM/SER) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Jose Alfredo Penaloza-Romero (3), | |
| Defendant. | |

---

Andrew R. Winter, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis MN 55415 (for the Government); and

Andrew H. Mohring and Douglas Olson, Assistant Federal Defenders, Federal Defender's Office, 300 South Fourth Street, Suite 107, Minneapolis MN 55415 (for Defendant Jose Alfredo Penaloza-Romero).

---

This matter is before the Court on Defendant Jose Alfredo Penaloza-Romero's Motion to Suppress Evidence Obtained as a Result of Search and Seizure. (ECF No. 45). This motion has been referred to the undersigned for a report and recommendation under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was initially held on August 5, 2019. (ECF No. 85). Due to a miscommunication among counsel, testimony as to Penaloza-Romero's motion was rescheduled for a later date. (ECF No. 85, at 1). The rescheduled hearing was held on August 27, 2019, where the Court heard testimony from DEA Special Agent Kelly Quernemoen. (ECF No. 93; Tr. of Aug. 27, 2019 Hrg, ECF No. 102). The Court received into evidence four documents: Gov't Ex. 1 (criminal complaint and affidavit, Case

1

No. 19-mj-236-DTS);[1] Gov't Ex. 2 (Minnesota state search warrant application, search warrant, and search warrant receipt for Minneapolis apartment); Gov't Ex. 3 (federal search warrant for five cell phones, Case No. 19-mj-278-SER); and Gov't Ex. 4 (Minnesota state search warrant application and search warrant for GPS tracking device of 2013 Dodge Dart vehicle).

Post-hearing briefing is now complete, (ECF Nos. 37, 39), and this motion is ripe for a determination by the Court. Based upon all the files, records, and proceedings herein, the undersigned recommends that Penaloza-Romero's motion be granted.

## I. FINDINGS OF FACT

### A. Pre-Arrest

Colorado police stopped a vehicle with California license plates on April 3, 2019. (Crim. Comp. Aff. of Detsouk Vixavong ¶ 4, ECF No. 56-1; Gov't Ex. 1).[2] The driver presented a California driver's license for William Consilvio, but was later identified as co-defendant Humberto Torres-Rodriguez. (Vixavong Aff. ¶ 4). During the traffic stop, Torres-Rodriguez consented to a vehicle search. (Vixavong Aff. ¶ 4). Officers found over 25 kilograms of methamphetamine in a false compartment in the vehicle. (Vixavong Aff. ¶ 4; Tr. 9:16–10:5). Torres-Rodriguez spoke to law enforcement and, in a post-*Miranda* statement, indicated that the vehicle was destined for Minnesota. (Vixavong Aff. ¶ 4; *see* Tr. 10:2–10). Torres-Rodriguez agreed to cooperate with law enforcement. (Tr. 10:2–10).

---

[1] This is also found on this case docket at ECF Nos. 1, 56.
[2] Special Agent Quernemoen testified that Vixavong's affidavit accounts for the "world of facts" supporting Penaloza-Romero's arrest. (Tr. 5:15–6:6, 7:15–8:6).

2

On April 4 and 5, 2019, under law enforcement's control, Torres-Rodriguez placed telephone calls to unidentified persons to coordinate the delivery of the methamphetamine to Minnesota. (Vixavong Aff. ¶ 5; Tr. 10:11–15:20). Torres-Rodriguez and the person or persons on the other line of the telephone calls arranged for delivery to Bloomington, Minnesota. (Vixavong Aff. ¶ 5; Tr. 10:6–17, 15:14–20). Torres-Rodriguez called a Mexican phone number and a United States phone number,[3] but law enforcement never determined who Torres-Rodriguez spoke to on those calls. (Tr. 10:11–15:20).

Law enforcement began surveilling the meeting point, a LaQuinta Inn in Bloomington, Minnesota. (Vixavong Aff. ¶ 5; Tr. 8:20–23, 15:21–16:8). At some point in the morning on April 5, 2019, a gray Dodge Dart with Minnesota license plates registered to Penaloza-Romero arrived and parked. (Vixavong Aff. ¶¶ 5–6; Tr. 8:7–12, 9:6–9, 16:9–17:9). Two occupants were in the vehicle, later identified as Penaloza-Romero and co-defendant Irwin Enrique Becerra. (Vixavong Aff. ¶ 5; Tr. 16:9–17:9). Becerrra either exited the vehicle carrying a backpack or exited the vehicle and grabbed a backpack from it. (Vixavong Aff. ¶ 6; Tr. 17:10–24). Whichever it was, law enforcement did not see Becerra and Penaloza-Romero hand each other anything. (Tr. 17:18–24). Penaloza-Romero remained in the vehicle. (Tr. 8:13–9:5, 17:10–13).

Becerra went into the LaQuinta Inn and met with Torres-Rodriguez in his hotel room. (Vixavong Aff. ¶ 6; Tr. 17:25–18:5). Becerra gave Torres-Rodriguez $15,900 in exchange for two packages of methamphetamine. (Vixavong Aff. ¶ 6; Tr. 19:13–20:6). During their conversation, neither mentioned Penaloza-Romero. (Tr. 18:9–19:5). Becerra

---

[3] It was not a Minnesota-based area code. (Tr. 10:11–13:11).

left the backpack with the currency in the hotel room. (Tr. 28:12–29:6). Becerra was arrested immediately as he left the hotel room. (Tr. 20:7–14; Vixavong Aff. ¶ 6). Torres-Rodriguez identified Becerra as the man that came into the hotel room for the transaction, but "never identified [Penaloza-Romero] as a person he interacted with that he knew of." (Tr. 13:12–23).

### B. Post-Arrest

Once Becerra was arrested, other officers were directed to arrest Penaloza-Romero, who was still sitting in the vehicle. (Tr. 8:13–9:5, 20:15–21:8; Vixavong Aff. ¶ 6). Law enforcement searched Penaloza-Romero's person following his arrest. (Tr. 6:7–11, 21:9–19). Penaloza-Romero had two cell phones, $2,242 in cash, and a set of keys. (Tr. 6:12–20, 21:9–23:2, 28:5–7).

In a post-*Miranda* interview after Penaloza-Romero had been arrested, Becerra stated Penaloza-Romero gave him the money to give to Torres-Rodriguez. (Vixavong Aff. ¶ 7; Tr. 23:3–24). Becerra "admitted that he knew this was a drug transaction." (Vixavong Aff. ¶ 7). Becerra also told law enforcement that he and Penaloza-Romero went to a Walmart before the LaQuinta Inn, but Special Agent Quernemoen never fact-checked Becerra's story. (Tr. 26:12–27:20). Law enforcement subsequently learned that Penaloza-Romero left his house the morning of April 5, 2019, went to a motel to pick up Becerra, then drove to the LaQuinta Inn. (Tr. 26:12–27:20). At some unspecified later time, law enforcement was able to link a GameStop receipt found in the backpack to Penaloza-Romero. (Tr. 28:12–29:14).

Following the arrests, law enforcement secured a search warrant for Penaloza-Romero's apartment in Minneapolis, Minnesota. (Vixavong Aff. ¶ 8; Gov't Ex. 2; *see* Tr. 6:16–23). The accompanying affidavit states that the Ramsey County Sheriff's Office began investigating Penaloza-Romero in March 2019.[4] It states that "investigators have seen [Penaloza-Romero] leave [the Minneapolis] address and meet with others for short visits, and based on my training and experience appeared to be consistent with making drug transactions." (Gov't Ex., at 2–3). The affidavit then claims that a confidential source—presumably Torres-Rodriguez, but it is not confirmed—was arrested with methamphetamine en route to Minnesota. (Gov't Ex. 2, at 3). Law enforcement then used Torres-Rodriguez to contact an "unidentified male . . . that directed [Torres-Rodriguez] to deliver the methamphetamine to Minnesota" and told him "that a person, later identified as [Becerra] and [Penaloza-Romero] would meet" Torres-Rodriguez for the methamphetamine. (Gov't Ex. 2, at 3). "A short time later," Penaloza-Romero went from his Minneapolis apartment to a motel in Bloomington then to the LaQuinta Inn. (Gov't Ex. 2, at 3). Becerra "admitted to investigators that he was picked up from the hotel by [Penaloza-Romero] and driven to the predetermined location in Bloomington to collect the 40 pounds of methamphetamine." (Gov't Ex. 2, at 3).

After securing this warrant, law enforcement used the keys taken during Penaloza-Romero's arrest to enter the apartment. (Tr. 24:1–5; *see* Vixavong Aff. ¶ 8). Law enforcement found a safe in the apartment's sole bedroom. (Vixavong Aff. ¶ 8; Tr. 24:6–

---

[4] The Ramsey County Sheriff's Office had an existing GPS tracking warrant for Penaloza-Romero's vehicle. (Tr. 24:23–26:11; Gov't Ex. 4). Special Agent Quernemoen was not aware of that warrant until the April 5, 2019. (Tr. 24:23–26:11).

5

17). Law enforcement opened the safe,[5] finding sixteen half-pound to one-pound packages of methamphetamine and $30,000 in cash. (Vixavong Aff. ¶ 8).

On April 26, 2019, law enforcement secured a search warrant for five cell phones seized from various individuals related to this case. (Gov't Ex. 3; *see* Tr. 6:24–7:6, 21:20–22:3). Law enforcement extracted no data from those cell phones. (Tr. 10:11–15:20, 21:23–22:3).

## II. ANALYSIS

### A. The Arrest

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "A police officer may, consistent with the Fourth Amendment, arrest someone without a warrant if the officer has probable cause to believe the person has committed a crime." *Peterson v. Kopp*, 754 F.3d 594, 598 (8th Cir. 2014); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). "Probable cause to arrest exists when there is 'a reasonable ground for belief of guilt' that is 'particularized with respect to the person to be searched or seized.'" *United States v. Chauncey*, 420 F.3d 864, 870 (8th Cir. 2005) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully,

---

[5] Law enforcement did not get a warrant to open the safe. (Tr. 24:6–17). The state search warrant allows law enforcement to search the Minneapolis apartment for "property and thing(s)" including "Safes, lockboxes and their keys, and safe deposit keys." (Gov't Ex. 2, at 5). It does not expressly indicate that law enforcement is permitted to open any such containers.

6

reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Courts look to whether the "totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (quotation omitted); *Pringle*, 540 U.S. at 371 ("To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.").

Here, law enforcement arrested Torres-Rodriguez in Colorado. He then communicated, under police supervision, with unidentified persons to arrange delivery of methamphetamine to Minnesota. While the delivery was coordinated to take place in Minnesota, where Penaloza-Romero lives, the United States-based telephone number Torres-Rodriguez communicated with did not have a Minnesota area code. Law enforcement never confirmed the identity of any individuals whom Torres-Rodriguez spoke with. Once in Minnesota, a car arrived at the LaQuinta Inn meeting point. There were two occupants. The passenger, Becerra, exited the vehicle and entered the hotel with a backpack. Law enforcement did not see Becerra and Penaloza-Romero exchange anything while in the vehicle. During the drug transaction inside the hotel, neither Torres-Rodriguez nor Becerra referenced Penaloza-Romero. Penaloza-Romero was then arrested.[6]

---

[6] While Special Agent Quernemoen attempted to portray on cross-examination this as a detention rather than arrest, she failed to specify any facts that would show the change in circumstances from detention to

7

Under the totality of the circumstances, law enforcement lacked probable cause to arrest Penaloza-Romero. There were no facts developed prior to Penaloza-Romero's arrest that provided a particularized reasonable belief that Penaloza-Romero was guilty of a drug crime. The only fact that law enforcement had developed at that time that could be traced to Penaloza-Romero was that he drove Becerra to the LaQuinta Inn where Becerra conducted a drug transaction while Penaloza-Romero remained sitting in his car. But "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). And while a "car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing," *Wyoming v. Houghton*, 526 U.S. 295, 304–05 (1999), the crime took place wholly inside the hotel room under police supervision, not in or near Penaloza-Romero's vehicle.

The Government cannot rely upon post-arrest evidence to justify the prior arrest of Penaloza-Romero because courts must look to the totality of circumstances leading up to the arrest, not those following it. *Pringle*, 540 U.S. at 371. The Court cannot reimagine the facts law enforcement knew before arresting Penaloza-Romero in a different light using all the facts learned subsequent to his arrest. Such revisionism does not comport with an appropriate probable cause analysis because *what* law enforcement knew is just

---

arrest. Special Agent Quernemoen unequivocally referred to this as an arrest on direct examination and all documents in this case reference Penaloza-Romero's arrest. It was only when she was cross-examined by defense counsel did she shift terminology. The Court concludes Penaloza-Romero was arrested as he sat in his vehicle; this was not an investigatory detention.

as important as *when* law enforcement knew it. Hindsight cannot bolster weak facts. Thus, the Government has no legal basis to urge consideration of the statements of either Becerra or Torres-Rodriguez made following Penaloza-Romero's arrest.

Finally, the Government, in part, points to Penaloza-Romero's ongoing investigation and GPS tracker warrant by the Ramsey County Sheriff's Office as a factor to be considered in the totality of the circumstances analysis. It is true that courts do "not merely look to the actual knowledge of the arresting officer, but to the combined knowledge of all of the officers involved." *United States v. Rich*, 795 F.3d 680, 682 (8th Cir. 1986). But Special Agent Quernemoen testified that the DEA did not know Penaloza-Romero's vehicle had a tracking device from the Ramsey County Sheriff's Office until after the arrests at the LaQuinta Inn. There was no interaction or communication between these state and federal law enforcement entities prior to Penaloza-Romero's arrest, *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993), so the collective knowledge doctrine does not create probable cause. Even including that information because a separate law enforcement agency was aware of it in *some* manner and it *could* have been obtained by the DEA, it only shows Penaloza-Romero left his home, went to a motel to pick up Becerra, then went to the LaQuinta Inn. This adds no new facts to the probable cause inquiry.

Therefore, this Court concludes law enforcement lacked probable cause to arrest Penaloza-Romero on April 5, 2019 at the hotel in Bloomington, Minnesota.

### B. The Identification of Penaloza-Romero

"Under the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality." *Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir. 1987) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963)).

Penaloza-Romero argues that law enforcement exploited his unlawful arrest via an out-of-court identification by Becerra. This Court disagrees. There is nothing in the record that suggests law enforcement did a show-up or anything similar for Becerra to identify Penaloza-Romero. The probable cause affidavits in both the criminal complaint and state search warrant application are vague as to how Penaloza-Romero was identified by Becerra, but they do not indicate that Penaloza-Romero's arrest factored into Becerra's identification of Penaloza-Romero as his driver. *See Hamilton v. Nix*, 809 F.2d 463, 465–66 (8th Cir. 1987). Likewise, while Becerra implicated Penaloza-Romero in the drug transaction by saying he provided the money, this does not appear to be an exploitation of Penaloza-Romero's illegal arrest for the same reasons. Both statements from Becerra appear to be independent from Penaloza-Romero's arrest.

### C. The Search Warrant

The exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984) (internal marks omitted). But here, the search warrant affidavit

10

relies on essentially the same facts as those relied upon by law enforcement to arrest Penaloza-Romero. Nonetheless, those facts are lacking under an independent analysis.

"The Fourth Amendment requires that search warrants be supported by probable cause." *United States v. Tripp*, 370 F. App'x 753, 757 (8th Cir. 2010) (citation omitted). "If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008) (quotation omitted); *Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

Outside of caselaw quotations, the Government offers a single line in its brief in support of the state search warrant: "A four-corners analysis of Exhibit 2 demonstrates that police had ample probable cause to obtain the warrant for the defendant's apartment." (ECF No. 121, at 7). This Court disagrees. Just like with the probable cause issues relating to Penaloza-Romero's illegal arrest, law enforcement independently lacked probable cause to search Penaloza-Romero's Minneapolis apartment.

Most damning, the search warrant affidavit contains a falsehood, or at least a reckless disregard for the truth. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978). Specifically, it states that Torres-Rodriguez contacted an "unidentified male . . . that directed [Torres-Rodriguez] to deliver the methamphetamine to Minnesota" and told him

11

"that a person, later identified as [Becerra] and [Penaloza-Romero] would meet" Torres-Rodriguez for the methamphetamine. (Gov't Ex. 2, at 3). As the facts of this case show, law enforcement never identified who Torres-Rodriguez spoke to on the telephone and Torres-Rodriguez was unable to identify Penaloza-Romero in any manner. Law enforcement had no idea who would be meeting with Torres-Rodriguez at the LaQuinta Inn, only that *someone* would be meeting him. By claiming, or at least implying, Torres-Rodriguez provided law enforcement with information that it would be Becerra and Penaloza-Romero meeting at the LaQuinta Inn for the drug transaction, then those two in fact showed up for that very drug transaction, it provided falsely bolstered facts to the issuing judge.

Even considering both these troublesome facts, the search warrant affidavit relies on essentially the same facts as those relied upon by law enforcement to arrest Penaloza-Romero, and those facts are insufficient for a finding of probable cause. The affidavit discusses the Colorado arrest, the fact that Penaloza-Romero left his house, picked up Becerra, and then drove Becerra to the LaQuinta Inn, and the controlled buy between Becerra and Torres-Rodriguez. Again, this information is deficient to any particularized suspicion towards Penaloza-Romero. More importantly, it fails to provide fair probability that contraband or evidence of a crime will be found at Penaloza-Romero's apartment because neither Becerra nor Torres-Rodriguez—those actually involved in the drug transaction—were ever at Penaloza-Romero's apartment prior to the drug transaction. There is no nexus between Penaloza-Romero's apartment and the criminal activity.

The only thing that ties all this together is the fact that Penaloza-Romero left his Minneapolis apartment and met with others for short visits with the conclusion that this "appeared to be consistent with making drug transactions." This is where the search warrant affidavit furthers its dive into the muck by presenting other factual information in a misleading manner. It purposefully ties together two previously unrelated investigations: the DEA's Torres-Rodriguez controlled buy and the Ramsey County Sheriff's Office's Penaloza-Romero tracking warrant. Special Agent Quernemoen testified, quite clearly, that the DEA had no indication that this state investigation was ongoing at the time of the controlled buy and only learned of it following Penaloza-Romero's arrest. But the search warrant application sews these investigations into one nice little bow to bolster the probable cause showing. It states that "investigators have seen [Penaloza-Romero] leave [the Minneapolis] address and meet with others for short visits, and based on my training and experience appeared to be consistent with making drug transactions." (Gov't Ex., at 2–3). The affidavit then goes into describing the controlled buy as though it were an offshoot of that same investigation. (Gov't Ex. 2, at 3). While law enforcement agents are presumed to have all information that is available to other law enforcement agents, this was also deliberately misleading. Even disregarding the misleading nature of this information, the search warrant application has the following facts relevant to Penaloza-Romero: Penaloza-Romero would leave his apartment for short periods of time and he drove Becerra to a drug transaction at a hotel. While this may have been sufficient for law enforcement to continue their investigation

or observation of Penaloza-Romero, it was simply not enough to rise to the level of fair probability that evidence of a crime would be found at Penaloza-Romero's apartment.

The state search warrant cannot be salvaged via the *Leon* good-faith exception. This operates as an exception to the exclusionary rule where "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," even though a court were later to conclude that the warrant was invalid. *United States v. Leon*, 468 U.S. 897, 920 (1984). "In order for the *Leon* good faith exception to apply to a warrant based on evidence obtained through a violation of the Fourth Amendment, the detectives' prewarrant conduct must have been close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *United States v. Hopkins*, 824 F.3d 726, 733 (8th Cir. 2016). The *Leon* good-faith exception is precluded where "the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge" or where "the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Cannon*, 703 F.3d 407, 412 (8th Cir. 2013). As already concluded, there was a false statement in the search warrant affidavit that was made either intentionally or with reckless disregard for the truth. Further, there was additional information presented in a misleading manner, buttressing the finding that the false statement was made intentionally or with reckless disregard for the truth. Moreover, for the reasons already concluded, the search warrant was so lacking

in probable cause to render belief in its existence unreasonable. As such, there can be no finding of good faith and the search warrant remains invalid for lack of probable cause.

The application of the exclusionary rule in this case serves to deter improper police conduct in the future. Law enforcement relied upon Penaloza-Romero's propinquity to a crime to arrest him for conspiracy. While law enforcement were right in their hunch that Penaloza-Romero was involved, they had not developed enough factual support for that hunch prior to acting. Law enforcement cannot shortcut the investigative process the way they did here. Moreover, law enforcement must not present misleading facts in seeking a search warrant. To permit the search warrant to stand here would condone law enforcement's generation of probable cause via massaging facts to craft a workable narrative rather than engaging in the necessary investigative work.

[Signature on following page.]

### III. RECOMMENDATION

Based upon the foregoing, and all files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Jose Alfredo Penaloza-Romero's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, (ECF No. 45), be **GRANTED**.

Date: October 28, 2019            *s/ Steven E. Rau*
                                  Steven E. Rau
                                  United States Magistrate Judge
                                  District of Minnesota

                                  *United States v. Penaloza-Romero (3)*
                                  Case No. 19-cr-130(3) (PAM/SER)

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.